IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NIRJAL POKHREL,

        Petitioner,                       3:26cv01052
                                         ELECTRONICALLY FILED

    v.

LEONARD ODDO ET AL.,

        Respondents.

**MEMORANDUM ORDER DENYING PETITIONER'S VERIFIED PETITION FOR A
WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 (Doc. 1)
<u>AND APPLICATION FOR RELIEF (Doc. 2)</u>**

Pending before the Court is Petitioner Nirjal Pokhrel's Verified Petition for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Habeas Petition") and Emergency Application

for a Temporary Restraining Order ("Application for Relief").  (Doc. 1, Doc. 2).  Notably, at a

June 10, 2026 Motions Hearing, the parties agreed that in light of Petitioner being removed from

the United States on June 9, 2026, Petitioner's Application for temporary relief in the form of a

temporary restraining order (TRO") should be reviewed by this Court as requesting permanent

relief.  (Doc. 15).  Thus, the Court will review the issues raised in Petitioner's Habeas Petition

and Application for Relief on their merits.

  **I. BACKGROUND**

On June 24, 2015, after a 7.8 magnitude earthquake and a number of significant

aftershocks struck the country, Nepal was first designated for Temporary Protective Status

("TPS")[1]. 80 Fed. Reg. 36346 (June 24, 2015).

---

[1] TPS is codified at 8 U.S.C. § 1254a.

https://www.federalregister.gov/documents/2015/06/24/2015-15576/designation-of-nepal-for-temporary-protected-status

On July 16, 2015, an Immigration Judge ordered Petitioner's removal, and this order gave Petitioner until August 17, 2015, to file an appeal.  (Doc. 10-1 at 2).[2]

On December 25, 2016, Petitioner, given his background as a Nepali citizen was granted TPS. (Doc, 1-2 at 2). There is no dispute that Petitioner consistently renewed his TPS as required since his Approval Notice was granted.

On May 22, 2018, the Department of Homeland Security ("DHS") announced the termination of Nepal's TPS designation. 83 Fed. Reg. 23705 (May 22, 2018).

https://www.federalregister.gov/documents/2018/05/22/2018-10868/termination-of-the-designation-of-nepal-for-temporary-protected-status  In making the determination to terminate Nepal's TPS, DHS reported as follows:

> Based on the review—which considered input received from other appropriate U.S. Government agencies, including the Department of State—the Secretary of Homeland Security has determined that the conditions supporting Nepal's 2015 designation for TPS on the basis of environmental disaster due to the April 25, 2015 earthquake are no longer met. Nepal has made considerable progress in post-earthquake recovery and reconstruction, and conditions in Nepal have significantly improved since the country's last TPS extension in 2016. The substantial disruption to living conditions has subsided for many of the Nepalis impacted by the earthquake. The number of citizens with access to clean water and sanitation has significantly increased, and reconstruction of thousands of homes has been completed or is underway. Schools and hospitals are functioning, and roads are being rebuilt. Additionally, government ministries and agencies are functioning at pre-earthquake levels, and Nepal is no longer temporarily unable to handle adequately the return of its nationals.

---

[2] The Court does not know whether Petitioner filed an appeal, but notes that Petitioner's Order of Supervision indicates that November 16, 2015 is the date of Petitioner's "final order" of removal. (Doc. 8-1 at 2).

*Id*. DHS also indicated that, "the designation of Nepal for TPS is terminated effective at 11:59 p.m., local time, on June 24, 2019, which is 12 months following the end of the current designation."

Less than a year later, on May 10, 2019, before the June 24, 2019 termination deadline, DHS published a Notice whereby it announced, "actions to ensure its compliance with the order of the United States District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019) ("order to stay proceedings")." 84 Fed. Reg. 09635 (May 10, 2019).

https://www.federalregister.gov/documents/2019/05/10/2019-09635/continuation-of-documentation-for-beneficiaries-of-temporary-protected-status-designations-for-nepal  In this Notice DHS further explained:

> "The claims raised in *Bhattarai v. Nielsen* are similar to, and will be informed by the resolution of, the claims being litigated before the Ninth Circuit Court of Appeals in *Ramos* v. *Nielsen,* No. 18-16981 (9th Cir. filed Oct. 12, 2018). For that reason, **DHS will not implement or enforce the decision to terminate Temporary Protected Status (TPS) for** Honduras or **Nepal** pending the resolution of the *Ramos v. Nielsen* appeal, or by other order of the court. **Beneficiaries under the TPS designations for Nepal** and Honduras **will retain their TPS**, provided that an individual's TPS status is not withdrawn because of ineligibility."

*Id.* (emphasis added).

On November 4, 2019, DHS issued a Notice announcing, "actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al. v. Nielsen, et al.,* No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern District of New York in *Saget, et al., v. Trump, et al.,* No. 18-cv-1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai v. Nielsen*, No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*")." 84 Fed. Reg. 59403 (Nov.

4, 2019).  https://www.federalregister.gov/documents/2019/11/04/2019-24047/continuation-of-documentation-for-beneficiaries-of-temporary-protected-status-designations-for-el. In this Notice

DHS further explained that, "[b]eneficiaries under the Temporary Protected Status (TPS)

designations for . . . Nepal . . . will retain their TPS while the preliminary injunction in *Ramos*

remains in effect, provided that an alien's TPS is not withdrawn because of individual

ineligibility.

> On December 9, 2020, DHS issued a Notice announcing:
>
> [A]ctions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018) (" *Ramos"*) and the U.S. District Court for the Eastern District of New York in *Saget, et. al.,* v. *Trump, et. al.,* No. 18-cv-1599 (E.D.N.Y. Apr. 11, 2019) (" *Saget"*), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019) (" *Bhattarai"*). **A panel of the U.S. Court of Appeals for the Ninth Circuit vacated the injunction in *Ramos* on September 14, 2020. However, because the appellate court has not issued its directive to the district court to make that ruling effective, the injunction remains in place at this time.** *See Ramos, et al.,* v. *Wolf, et al.,* No. 18-16981 (9th Cir., September 14, 2020). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* order remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility.

85 Fed. Reg. 79208 (Dec. 9, 2020).

https://www.federalregister.gov/documents/2020/12/09/2020-27154/continuation-of-documentation-for-beneficiaries-of-temporary-protected-status-designations-for-el (emphasis

added).

> On September 10, 2021, DHS issued a Notice, announcing:
>
> [A]ctions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al. v. Nielsen*, et. al., No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern *District of New York in Saget, et. al., v. Trump, et. al.*, No. 18-cv-1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S.

4

District Court for the Northern District of California to stay proceedings in *Bhattarai v. Nielsen*, No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect, provided that their TPS is not withdrawn because of individual ineligibility.

86 Fed. Reg. 50725 (Sept. 10, 2021).

https://www.federalregister.gov/documents/2021/09/10/2021-19617/continuation-of-

documentation-for-beneficiaries-of-temporary-protected-status-designations-for-el.

On November 16, 2022, DHS issued a Notice, announcing:

[A]ctions to ensure its continued compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et al.,* No. 18-cv-01554 (N.D. Cal. October 3, 2018) (" *Ramos* ") and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19-cv-00731 (N.D. Cal. March 12, 2019) (" *Bhattarai* "). Beneficiaries under the existing Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Honduras, and Nepal, the 2011 designation of Haiti, and the 2013 designation of Sudan will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect, provided that their TPS is not withdrawn because of individual ineligibility.

87 Fed. Reg. 68717 (Nov. 16, 2022).

https://www.federalregister.gov/documents/2022/11/16/2022-24984/continuation-of-

documentation-for-beneficiaries-of-temporary-protected-status-designations-for-el.

On June 21, 2023, DHS rescinded the TPS terminations for Nepal and extended its

TPS designation. See 88 Fed. Reg. 40317 (Jun. 21, 2023).

https://www.federalregister.gov/documents/2023/06/21/2023-13019/reconsideration-and-

rescission-of-termination-of-the-designation-of-nepal-for-temporary-protected.  DHS indicated

that, "[a]fter conducting an independent assessment of the country conditions in Nepal as they

existed in 2018 and exist today, the Secretary has determined that Nepal's 2015 TPS designation

should not have been terminated. . . . [T]he conditions in Nepal that gave rise to its TPS

designation in 2015 persisted in 2018 and persist to this day. Accordingly, the Secretary is, upon reconsideration, rescinding the 2018 decision terminating Nepal's TPS designation and extending that designation for an additional 18 months." *Id.* Under the June 21, 2023 recission, the expiration date for Nepal's TPS designation was June 24, 2025. *Id.*

On June 6, 2025, DHS published a Notice in the Federal Register announcing the termination of Nepal's TPS designation. 90 Fed. Reg. 24,151 (June 6, 2025). https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-nepal-for-temporary-protected-status. In this Notice DHS indicated, "[a]fter August 5, 2025, nationals of Nepal (and aliens having no nationality who last habitually resided in Nepal) who have been granted TPS under Nepal's designation will no longer have TPS." *Id.* In reaching this conclusion the DHS Secretary announced she had determined that "[b]ased on her review and consultation with the Department of State, . . . overall, there are notable improvements in environmental disaster preparedness and response capacity, as well as substantial reconstruction from the earthquake's destruction such that there is no longer a disruption of living conditions and Nepal is able to handle adequately the return of its nationals." *Id.*

The day after the Termination Notice was published in the Federal Register, on June 7, 2025, the National TPS Alliance and several individual TPS holders sued the federal government in the United States District Court for the Northern District of California, alleging, *inter alia*, that the termination of TPS for Nepal was contrary to the TPS statute, in violation of the Administrative Procedure Act, and unlawful under the Fifth Amendment. *Nat'l TPS All. v. Noem*, Civ. No. 3:25-5687-TLT (N.D. Cal. Filed July 7, 2025) (challenging termination of TPS for Nepal, Nicaragua, and Honduras).

On October 2, 2025, the District Court for the Northern District of California certified a nationwide class[3] consisting of "[a]ll persons who have been granted TPS pursuant to the TPS designation of Nepal and who have not been granted lawful permanent residence." Class Certification Order, *Nat'l TPS All. v. Noem*, Civ. No. 3:25-5687 (N.D. Cal. Oct. 2, 2025) (Doc. 134 at 6).

On December 31, 2025, the District Court for the Northern District of California issued a final decision in the class action, declaring that termination of TPS for Nepal was "unlawful" and vacating DHS's termination decision regarding Nepal. *Nat'l TPS All. v. Noem,* 819 F.Supp.3d 1049, 1094 (N.D. Cal. Dec. 31, 2025) (Doc. 197 at 51-52) ("*Nat'l TPS All. I*").

On or about January 5, 2026, during a routine check-in appointment, ICE officers took Petitioner into custody for the first time at its York Field Office located at 1605 Clugston Road, York, Pennsylvania, 17404.  (Doc. 1, ¶ 37).

On January 16, 2026, Petitioner filed a counseled petition for writ of habeas corpus and a motion for a preliminary injunction, and Petitioner was released from ICE custody under an order of supervision ("OSUP"). (Doc. 8-1).  Petitioner was told that he was released because he had TPS. See *Pokhrel v. Oddo*, Civ. No. 3:26-60 (W.D. Pa.).  Following his release, Petitioner attended two check-ins: the first, a 7-day check-in, at the York Field Office of ICE, and the second, a 15-day check-in, at another office, without incident. (Doc. 1, ¶ 39).

On February 9, 2026, the district court's *Nat'l TPS All. I* vacatur order was stayed by the United States Court of Appeals for the Ninth Circuit.  *Nat'l TPS All. v. Noem*, No. 26-199 (9th Cir. Feb. 9, 2026) ("*Nat'l TPS All. II*").  (Doc. 11.1).

---

[3] Petitioner asserts, and Respondents do not challenge, that he is a member of this class. (Doc. 1, ¶ 30). Petitioner, however, was not named as a class representative.

On April 6, 2026, the Court of Appeals held that the "February 9, 2026 stay would remain in effect pending the resolution of *Noem v. Dahlia Doe*, No. 25-1083, and *Trump v. Miot*, No. 25-1084, by the Supreme Court[.]" *Nat'l TPS All. v. Noem*, No. 26-199 (9th Cir. Apr. 6, 2026) (Doc. 35).

On May 6, 2026, at his 3-month check-in, Petitioner was again arrested and detained by ICE.[4] (Doc. 1, ¶ 40).

On June 9, 2026, Petitioner was removed from the United States to Nepal.  (Doc. 13).

## II. DISCUSSION OF PETITIONER'S CLAIM OF VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT 8 U.S.C. §1254a (COUNT 1 OF HABEAS PETITION)

Petitioner, a citizen of Nepal, was detained by DHS on May 6, 2026, until he was removed from the United States of America ("U.S.") pursuant to 8 U.S.C. § 1231 ("Section 1231") on June 9, 2026.[5]

Petitioner asserts that he has had Temporary Protective Status ("TPS") since 2016, and therefore: (1) his detention and removal from the United States by Respondents violates Section 1254a of the Immigration and Naturalization Act ("INA") ("Section 1254a"); and (2) his detention violates Petitioner's substantive and procedural due process rights under the Fifth Amendment to the United States Constitution ("Fifth Amendment").  (Doc. 1).

---

[4] Petitioner asserts, and Respondents do not challenge, that he: (1) has no criminal record, and has never been arrested for, accused of, or convicted of, a crime; and (2) is married to a U.S. citizen, has two young children (both U.S. citizens), and, at the time of his detention and removal, was in the process of applying for permanent residency based on his wife's status as a U.S. citizen and had a Form I-130 and Form I-485 (adjustment of status) pending.

[5] While the Government asserted that Petitioner's removal from the United States on June 9, 2026, rendered Petitioner's Habeas Petition moot, at a previously scheduled Motions Hearing, the Court ruled that Petitioner's deportation did not moot this habeas petition and having so ruled, the parties agreed that the Court would adjudicate the merits of Petitioner's Habeas Petition and Application for Relief, and not review Petitioner's Application as a request for preliminary relief.

### A.  Historical Background - Creation of Temporary Protective Status

Temporary Protective Status ("TPS") was created by Congress in 1990 as part of the Immigration Act Immigration Act of 1990, which was signed into law by President George H.W. Bush.[6] IMMIGRATION ACT OF 1990, PL 101–649, November 29, 1990, 104 Stat 4978. The purpose of Congress' creation of TPS was to provide temporary humanitarian protection to noncitizens already present in the United States who could not safely return to their home countries because of armed conflict, natural disasters, or other extraordinary, temporary conditions.[7]

TPS arose because of humanitarian crises which occurred throughout the 1980's throughout Central America, and specifically in El Salvador, which sent citizens from those countries fleeing from civil wars. 135 Cong. Rec. D607-01, 135 Cong. Rec. D607-01, D607, 1989 WL 178406; *see also*, 136 Cong. Rec. H12358-03, 136 Cong. Rec. H12358-03, H12360, 1990 WL 164526 ("The legislation also provides for temporary safe haven to Salvadorans, as proposed by Chairman Moakley. . . . Those who fled the violence and death in El Salvador will not be sent home because of temporary protected status that they are given, and beyond that the

---

[6] In a statement, former President Bush said, "In signing this legislation, I am concerned with the provision of S. 358 that creates a new form of relief known as 'temporary protected status.' The power to grant temporary protected status would be, except as specifically provided, the 'exclusive authority' by which the Attorney General could allow otherwise deportable aliens to remain here temporarily because of their nationality or their region of origin. I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions." 1990 U.S.C.C.A.N. 6801-1, 6801-2.

[7] Prior to the enactment of TPS, the United States Government had to utilize *ad hoc* measures to protect certain groups of noncitizens from deportation. *Nat'l TPS Alliance*, 150 F.4th at 1009 ("For about three decades before the enactment of the statute authorizing TPS, presidential administrations exercised prosecutorial discretion to grant protection from deportation to certain groups of noncitizens on an *ad hoc* basis.") *citing* H.R. Rep. No. 100-627, at 6 (1988) ( "[E]very Administration since and including that of President Eisenhower has permitted one or more groups of otherwise deportable aliens to remain temporarily in the United States out of concern that . . . forced repatriation . . . could endanger their lives or safety.").

rules are put in place for temporary protected status for other nationals such as the Chinese and the Liberians and the Kuwaitis and the Lebanese who might need this protection now, and other nationalities who might need that protection in the future.").[8]

Thus, Congress created a uniform statutory framework so that the United States Government could uniformly respond to humanitarian emergencies.[9] Pub Law 101-649, Nov. 29, 1990.

The United States Supreme Court has explained:

A provision of [the Immigration Act] establishes the TPS program, which provides humanitarian relief to foreign nationals in the United States who come from specified countries. See § 1254a. The Government may designate a country for the program when it is beset by especially bad or dangerous conditions, such as arise from natural disasters or armed conflicts. The country's citizens, if already present in the United States, may then obtain TPS. That status protects them from removal and authorizes them to work here for as long as the TPS designation lasts. A person's unlawful entry into the United States will usually not preclude granting him TPS. *See* § 1254a(c)(2)(A)(ii); 8 C.F.R. § 244.3 (2020).

And relevant here, the TPS provision states: "[F]or purposes of adjustment of status under section 1255," a person given TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." § 1254a(f)(4).

*Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021).[10]

---

[8] Chairman Moakley responded, "I am very delighted that the conferees saw fit to maintain my position to offer temporary protection to the refugees from El Salvador. It is no secret, Mr. Speaker, that El Salvador is currently engulfed in a very brutal civil war that has claimed over 70,000 lives. The violence perpetrated by both the left and the right continues to take a very high toll. And like it or not, we in the United States must bear some of the responsibility for what happens in that very small country. Mr. Speaker, the modest protections in this bill to help these refugees is the right thing to do. It maintains the high traditions and standards that have become a hallmark for U.S. immigration policy." 136 Cong. Rec. H12358-03, 136 Cong. Rec. H12358-03, H12364, 1990 WL 164526.

[9] Following the passage of the Immigration Act of 1990, the first TPS designation was conferred upon El Salvador whose citizens fled civil war and were already in the United States.

[10] In the *Sanchez* case, the Supreme Court adjudicated a split among United States' Circuit Courts, holding in accordance with the United States Court of Appeals for the Third Circuit as follows: "We now affirm the Third Circuit's decision that . . . [t]he TPS program gives foreign nationals nonimmigrant status, but it does not admit them. So the conferral of TPS does not make an unlawful entrant (like Sanchez) eligible under § 1255 for adjustment to LPR status." *Sanchez*, 593 U.S. at 414.

### 1. Purpose of Temporary Protective Status

The stated purpose of TPS was (and is) to prevent noncitizen individuals heralding from TPS-designated countries from being removed to their home countries where their lives and safety would be at risk due to ongoing emergencies – namely, armed conflicts, natural disasters and other "extraordinary and temporary conditions" in their home countries. 8 U.S.C. § 1254a(b)(1)(A-C). Although TPS: (1) prohibits noncitizen individuals from being deported during their home country's designation period, and (2) enables TPS-designated noncitizens to obtain employment authorization while in the United States, TPS does not confer lawful, permanent resident status nor provide a direct pathway to United States citizenship. *See* 8 U.S.C. §§ 1254a(a)(1)(A), (a)(1)(B), (a)(4), (f)(1) ("During a period in which an alien is granted temporary protected status under this section . . . the alien shall not be considered to be permanently residing in the United States under color of law[.]").

### 2. Administration of TPS

As noted by the Supreme Court in *Sanchez*, the TPS portion of the Immigration Act of 1990 indicates the ". . . Government may designate a country for the program . . . ." *Sanchez,* 593 U.S. at 412. "Government" was defined by the Act as "the Attorney General":

> In the case of an alien who is a national of a foreign state designated under subsection (b) . . . and who meets the requirements of subsection (c), the Attorney General, in accordance with this section—
>
> **(A)** may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect . . . .

8 U.S.C. § 1254a(a)(1)(A).[11]

---

[11] Although TPS designation authority originally belonged to the Attorney General (8 U.S.C. § 1254a), in 2002 Congress transferred immigration-administration functions from the Department of Justice to the

Thus, Congress has empowered the Secretary of Homeland Security ("Secretary" or "DHS Secretary") with the authority to designate a foreign country for TPS when conditions in that country essentially prevent its nationals from returning there safely. Before making a designation, the Secretary must consult with "appropriate" Government agencies regarding conditions in the affected country. 8 U.S.C. § 1254a(b)(1).

TPS designations, as the name suggests, are "temporary" [12] and therefore, subject to periodic review. 8 U.S.C. § 1254a(b)(3)(A). The TPS statute requires the Secretary to review the conditions in each designated country at least 60 days before the expiration of the country's initial period of designation (and any extension of its TPS designation), to determine whether the statutory conditions supporting the country's TPS continue to exist. 8 U.S.C. § 1254a(b)(3)(A).

If the Secretary determines that a foreign nation continues to meet the conditions for designation under § 1254a(b)(1), the designation will be extended for an additional period of 6 months, 12, or 18 months at the Secretary's discretion. 8 U.S.C. § 1254a(b)(3)(C). If the Secretary determines that the statutory conditions no longer exist, the designation shall be terminated, effective no earlier than 60 days after publication of the termination notice in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B) (". . . by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3) but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).)".

---

Department of Homeland Security. *See* Title 6 U.S.C. § 557 (directing that statutory references to the Attorney General be read as references to the Department of Homeland Security Secretary).

[12] "The initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the [Secretary], of not less than 6 months and not more than 18 months." 8 U.S.C. § 1254a(b)(2)(B).

12

Simply stated, a country's continued eligibility for TPS depends on recurring reviews by the DHS Secretary and the Secretary's findings that the conditions justifying protection remain ongoing.

### 3. Temporary Protective Status of Nepal

Because Petitioner is a citizen of Nepal, the Court must consider the TPS status of Nepal.

### a. Background and Initial Designation

The Department of Homeland Security ("DHS") designated Nepal for Temporary Protected Status ("TPS") on June 24, 2015, following the devastating earthquakes which struck the country in April and May 2015.  DHS determined that the environmental disaster and resulting disruption of living conditions prevented Nepal from adequately handling the return of its nationals. The designation was made pursuant to Section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a. See *Designation of Nepal for Temporary Protected Status*, 80 Fed. Reg. 36, 346 (June 24, 2015).

https://www.federalregister.gov/documents/2015/06/24/2015-15576/designation-of-nepal-for-temporary-protected-status

### b. Extensions and Litigation

After the initial designation, DHS extended Nepal's TPS designation based on continuing recovery efforts and humanitarian concerns. In May 22, 2018, DHS announced its intention to terminate Nepal's TPS designation concluding that the conditions resulting from the earthquake no longer justified protection. However, implementation of the termination was delayed for several years due to ongoing federal litigation challenging TPS terminations affecting multiple countries.[13] In 2023 DHS formally rescinded the 2018 termination decision and extended

---

[13] As explained, in those intervening years, DHS published its reasons for extending Nepal's TPS in the Federal Register.

Nepal's TPS designation through June 24, 2025. See *Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal*, 88 Fed. Reg. 40, 317 (June 21, 2023). https://www.federalregister.gov/documents/2023/06/21/2023-13019/reconsideration-and-rescission-of-termination-of-the-designation-of-nepal-for-temporary-protected.

### c. Current Status

On June 6, 2025, DHS published a notice terminating Nepal's TPS designation after determining that the conditions supporting the original designation no longer existed and that Nepal had sufficiently recovered from the 2015 earthquake and its aftermath. Following consultation with appropriate government agencies, the Secretary of Homeland Security concluded that Nepal no longer met the statutory requirements for TPS under 8 U.S.C. § 1254a(b)(1). DHS therefore terminated Nepal's TPS designation effective August 5, 2025. *See Termination of the Designation of Nepal for Temporary Protected Status*, 90 Fed. Reg. 24, 151 (June 6, 2025). https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-nepal-for-temporary-protected-status.

### B. Petitioner's Claim in Count One of His Habeas Petition Fails on its Merits

In Count One of his Habeas Petition, Petitioner asserts that then-DHS Secretary Noem's termination of Nepal's TSP designation was invalid, and thus, at the time of his detention on May 6, 2026, Petitioner had TPS and his detention violated 8 U.S.C. § 1254a.[14]

---

[14] In Petitioner's memorandum in support of his Application for Relief, Petitioner additionally asserts that his TPS precluded Respondents from *removing* Petitioner from the United States:

> Mr. Pokhrel has been duly granted Temporary Protected Status ("TPS"), which remains in effect, and as such, Respondents are forbidden by clear statutory mandate from detaining him or deporting him. 8 U.S.C. § 1254a(d)(4) ("[a] [noncitizen] provided temporary protected status . . . shall not be detained by the Attorney General on the basis of the [noncitizen's] immigration status in the United States.") (emphasis added); id. 1254a(1)(A)

In support of Petitioner's position that Respondents violated Section 1254a when they detained him on May 6, 2026, and removed him from the United States on June 9, 2026, Petitioner first cites to the decision of the United States District Court for the Northern District of California in *Nat'l TPS All. v. Noem*, 819 F.Supp.3d 1049 (N.D. Cal. 2025) (*Nat'l TPS All I*"), and asserts that this Order "has preclusive effect in this case as to the controlling question of whether Mr. Pokhrel retains TPS status."  (Doc. 1 at ¶ 5, Doc. 3 at 7, 16-17).

Petitioner also cites to a number of other district court cases which Petitioner contends supports his position that Petitioner should be released from detention and cannot be removed from the United States because of his TPS.  (Doc. 3 at 17-18).

1. **The decision of the United States District Court for the Northern District of California in *Nat'l TPS All. v. Noem*, 819 F.Supp.3d 1049 (N.D. Cal. 2025) is not binding on this Court**

Petitioner's contention that the *Nat'l TPS All. I* decision "has preclusive effect in this case as to the controlling question of whether Mr. Pokhrel retains TPS status," is premised on the "ORDER ON MOTION TO DISMISS; MOTION TO EXCLUDE EXPERT TESTIMONY; MOTION FOR PARTIAL SUMMARY JUDGMENT; MOTION FOR SUMMARY JUDGMENT" entered by the district court in *Nat'l TPS All. I* in December 31, 2025, wherein:

> *[T]he Court declares that the termination of TPS for Nepal on June 6, 2025, and Honduras and Nicaragua on July 7, 2025, were unlawful under the APA.* Moreover, the Court vacates the Secretary's termination decisions with respect to Honduras, Nepal, and Nicaragua. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31, 144 S.Ct. 2440, 219 L.Ed.2d 1139 (2024) (Kavanaugh, J., concurring) ("When a federal court concludes that an agency

---

("[T]he Attorney General . . . shall not remove the alien from the United States during the period in which such status is in effect.") (emphasis added)[.]

(Doc. 2 at 2) (emphasis in original).  (*See also* Doc. 3 at 11-13, Doc. 8 at 3, Doc. 11 at 1-3). In reviewing Count One of Petitioner's Habeas Petition, the Court will address whether Respondents violated Petitioner's rights under *both* Title 8 U.S.C. § 1254a(d)(4) and Title 8 U.S.C. § 1254a(a)(1)(A)) when they detained and deported Petitioner.

> adjudicative order [or any other agency action] is unlawful, the court must vacate that order.").
>
> The Court directs entry of a final judgment under Rule 54(b) on the APA claims for which the Court has granted summary judgment in favor of Plaintiffs. . . . The Clerk of the Court is directed to enter a final judgment in favor of Plaintiffs on the APA claims raised in Plaintiffs' motion for partial summary judgment related to (1) the termination of TPS for Honduras (2) the termination of TPS for Nepal, and (3) the termination of TPS for Nicaragua.

*Nat'l TPS All.*, 819 F. Supp.3d at 1094 (emphasis added).[15]

Contrary to Petitioner's assertion, the Court finds that the district court's declaration in *Nat'l TPS All. I* that the termination of Nepal's TPS status was unlawful is not binding on this Court, because on February 9, 2026, the United States Court of Appeals for the Ninth Circuit entered an Order with respect to the district court's *Nat'l TPS All. I* December 31, 2015 decision, wherein the appellate court stayed "the district court's order vacating the termination of TPS for Nepal . . . pending appeal." *Nat'l TPS All. v. Noem,* No. 26-199 (9th Cir. Feb. 9, 2026) (Doc. 11.1) ("*Nat'l TPS All II*").

Specifically, in *Nat'l TPS All.*, the Court of Appeals for the Ninth Circuit: (1) explained that "[t]he district court determined that the decisions violated the Administrative Procedure Act and it entered a final judgment vacating the terminations;" (2) concluded "that the government is likely to succeed on the merits of its appeal either by showing that the district court lacked jurisdiction or by prevailing on plaintiffs' arbitrary-and-capricious APA challenge;"[16] and

---

[15] In an earlier decision, the *Nat'l TPS All*. *I* Court granted plaintiffs' motion to certify the Honduras TPS Class, the Nepal TPS Class, and the Nicaragua TPS Class. *Natl. TPS All. v. Noem*, Civ. No. 25-5687, 2025 WL 4110426, at *17 (N.D. Cal. Oct. 2, 2025). As stated above, Petitioner asserts in his Habeas Petition, and Respondent do not challenge, that he is a member of the Nepal TPS Class; the Nepal TPS Class is comprised of: "All persons who have been granted TPS pursuant to the TPS designation of Nepal and who have not been granted lawful permanent residence." (Doc. 1, ¶¶ 29-30).

[16] Importantly, the Court of Appeals for the Ninth Circuit explained in its *Nat'l TPS All. II*. Order:

16

(3) stayed "the district court's order vacating the termination of TPS for Nepal, Honduras, and Nicaragua," "pending appeal."[17]

Thus, because the Court of Appeals for the Ninth Circuit has stayed the coercive relief order in *Nat'l TPS All. I* (vacatur of the termination of Nepal, Honduras, and Nicaragua's TPS designation) that rested on the same analysis as the declaratory judgment at issue, a binding court

---

In 8 U.S.C. § 1254a(b)(5)(A), Congress precluded "judicial review of any determination of the [Secretary] with respect to the designation, termination, or extension of a designation, of a foreign state" under section 1254a(b). The government argues that the Secretary's terminations of TPS for Nepal, Honduras, and Nicaragua are therefore unreviewable. In our recent decision in National TPS Alliance v. Noem (NTPSA III), we held that section 1254a(b)(5)(A) "does not bar judicial review of a claim that the Secretary exceeded her statutory authority." No. 25-5724, 2026 WL 226573, at *9 (9th Cir. Jan. 28, 2026). But that case involved the vacatur of a TPS designation, an action that we held was in excess of the Secretary's statutory authority. *Id.* at *15–16. This case, by contrast, involves a termination of TPS, an action expressly authorized by statute. *See* 8 U.S.C. § 1254a(b)(3) (providing for designations, terminations, and extensions of TPS). At this preliminary stage, we conclude that the government has shown a likelihood of prevailing in its argument that the Secretary's action is unreviewable because it is a "determination . . . with respect to the . . . termination . . . of a designation[] of a foreign state." *Id.* § 1254a(b)(5)(A).

In addition, our preliminary analysis of plaintiffs' APA claims is that the government is likely to prevail in its argument that the Secretary's decision-making process in terminating TPS for Honduras, Nicaragua, and Nepal was not arbitrary and capricious. Specifically, the government can likely show that the administrative record adequately supports the Secretary's action, that the TPS statute does not require the Secretary to consider intervening country conditions arising after the events that led to the initial TPS designation, and that the Secretary's decision not to consider intervening conditions does not amount to an unexplained change in policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). The government also can likely show that the Secretary consulted with appropriate agencies, see 8 U.S.C. § 254a(b)(3)(A), adequately considered conditions in Nepal, Honduras, and Nicaragua, and gave facially legitimate reasons for why terminating TPS for each country was warranted.

*Nat'l TPS All.*, No. 26-199 (9th Cir. Feb. 9, 2026) (Doc. 11.1 at 3-4).

[17] Subsequently, on April 6, 2026, the appellate court entered an additional Stay Order: "The government's motion to stay appellate proceedings (Dkt. No. 28) is GRANTED. This case shall be held in abeyance pending the resolution of *Noem v. Dahlia Doe*, No. 25-1083, and *Trump v. Miot*, No. 25-1084, by the Supreme Court. The briefing schedule is suspended. The stay entered on February 9, 2026 (Dkt. No. 11), shall remain in effect pending further order of this court. Within 7 days of the issuance of the Supreme Court's decision in *Dahlia Doe* and *Miot*, the parties shall file a joint status report proposing a schedule to govern further proceedings." *Nat'l TPS All. v. Noem*, No. 26-199 (9th Cir. Apr. 6, 2026) (Doc. 35).

decision does not exist that has set aside then-DHS Secretary Noem's 2025 termination of Nepal's TPS.[18]   See *Olivero Nava v. Warden Port Isabel Serv. Processing Ctr.*, Civ. No. 1:26-230, 2026 WL 1018343, at *6 (S.D. Tex. Apr. 15, 2026) (explaining with respect to a TRO motion brought by Petitioners, Venezuelan national aliens who claimed they were being detained in violation of Section 1254a due to their TPS status and that the district court in Texas was bound by a determination by a California  district court that then-DHS Secretary Noem's termination of Venezuela's TPS status was unlawful, "Petitioners' position that they retained TPS status because of the Declaratory Judgment "turns on the mistaken view that the Declaratory Judgment in itself affected the Secretary's 2025 Actions. It did not. Such an effect would require coercive relief – *i.e.*, the setting aside or vacatur of those actions.  Petitioners fail to demonstrate how the Declaratory Judgment afforded such relief.   . . .   As a result, no binding court decision exists that has set aside the Secretary's 2025 Actions.  And those actions stripped Petitioners of TPS."); *id.* (ultimately determining that Petitioners had failed to show a substantial likelihood of succeeding on the merits of their claim: "Petitioners also argue that they 'ask only that the Court apply the preclusive effect of [the Declaratory Judgment] in this case[,]' and that after doing so,

---

[18] Having concluded that the *Nat'l TPS All. I* decision in is not binding on this Court, the Court makes the following additional conclusions with respect to the litigants involved, and the decision rendered, in the *Nat'l TPS All., I* decision.

Petitioner, who lives in Mechanicsburg, Pennsylvania, approximately 9 miles from Harrisburg, the site of the United States District Court for the Middle District of Pennsylvania, and approximately 199 miles from Pittsburgh, the location of the United States District Court for the Western District of Pennsylvania, chose to litigate the propriety of the termination of TPS for Nepal, Honduras, and Nicaragua by then-DHS Secretary Noem in the Northern District of California, over 2,770 miles away from his home to achieve, in essence, a nationwide declaration that the terminations were unlawful.

This attempt to "preclusively bar" this Court in the Western District of Pennsylvania, and "preclusively bar" the United States Court of Appeals for the Third Circuit, from considering the merits of the pending litigation, is an apparent aggressive example of forum shopping to obtain a favorable ruling under the guise of a "punitive class action," and then try to force a so-called national-wide "declaration" on this federal district court and the petitioner's home Court of Appeals.

'the Court must find that Petitioners retain TPS, and thus that [their] detention is unlawful.' . . . Petitioners in essence request that the Court provide coercive relief based on the reasoning that undergrids the Declaratory Judgment and for which the Supreme Court stayed a coercive remedy. The Court declines to do so."). *See also O.G.M. v. Sage*, Civ. No. 4:26-780, 2026 WL 1242754, at *3 n. 35 (M.D. Pa. May 6, 2026) (explaining with respect to a Venezuelan national alien who alleged that his detention violated his rights under § 1254a of the INA related to those who validly hold TPS: (1) "Both parties agree that then Secretary Noem terminated TPS as to previously qualifying Venezuelans, and agree that, in a case filed in the United States District Court for the Northern District of California, that termination of TPS was twice found invalid and TPS was twice (once on a motion for a preliminary injunction and once on a grant of summary judgment) ordered reinstated for certain individuals, which would include O.G.M.; (2) "both of those orders were stayed by the Supreme Court pending resolution of appeals to the United States Court of Appeals for the Ninth Circuit and any potential petition for certiorari to the Supreme Court. Those stays remain in effect;" and (3) "[t]he District Court later entered a declaratory judgment finding that termination of TPS for the relevant Venezuelans was unlawful;" and then concluding: "This creates a thorny question as to whether O.G.M. is entitled to release on the basis of his TPS; the declaratory judgment decision held that the termination of TPS was unlawful, but the Supreme Court has stayed any coercive effect of the holdings, meaning O.G.M. does not currently hold valid TPS. Given this, there is good reason to believe that O.G.M. is not entitled to release on the basis of his prior TPS.") (citations omitted)*;*

*Canizalez Polanco v. Unknown Party #1*, Civ. No. 1:26-747, 2026 WL 935902, at *3 (W.D. Mich. Apr. 7, 2026) (explaining: "Petitioner contends that Respondents have unlawfully detained Petitioner despite Petitioner's TPS. Based on this, Petitioner seeks immediate release, alleging a

19

violation of 8 U.S.C. § 1254a(d)(4), which provides that if a noncitizen has TPS, then the noncitizen "shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States." 8 U.S.C. § 1254a(d)(4)," and determining: "As set forth above, Secretary Noem vacated the extension of the 2023 TPS Designation for Venezuela and then signed off on the termination of TPS for Venezuela. *See supra* note 2. The validity of Secretary Noem's actions regarding TPS for Venezuela is currently being litigated. In October 2025, the United States Supreme Court allowed the termination of TPS for Venezuela to take effect pending the Government's appeal and "disposition of a petition for a writ of certiorari, if such writ is timely sought." *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025). On January 28, 2026, in *National TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. 2026), the United States Court of Appeals for the Ninth Circuit affirmed the United States District Court for the Northern District of California's finding that Secretary Noem exceeded her statutory authority by revoking TPS protections for Venezuelans and Haitians. At this time, based on the procedural history of *National TPS Alliance v. Noem*, this Ninth Circuit case does not affect the Court's analysis in this habeas action. *Cf. Nat'l TPS All.*, 146 S. Ct. at 24 (allowing the termination of TPS for Venezuelan nationals to take effect pending the Government's appeal). Therefore, the Court will not grant Petitioner's request for immediate release based on Petitioner's prior TPS.").

### 2. Then-DHS Secretary Noem's termination of Nepal's TPS Designation in 2025 did not violate Section 1254a

Having concluded that this Court is not bound by any holding set forth by the district court in its *Nat'l TPS All. I* decision in ruling in this habeas matter, the Court further finds that to the extent that Petitioner's argument in Count One of his Habeas Petition can be construed to suggest that then-DHS Secretary Noem failed to follow the proper statutory process set forth in

Section 1254a for the termination of Nepal's TPS, the Court finds this argument to have no merit.

On June 6, 2025, DHS published a Notice in the Federal Register announcing the termination of Nepal's TPS designation. 90 Fed. Reg. 24,151 (June 6, 2025). https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-nepal-for-temporary-protected-status. Over a year later, on May 6, 2026, Petitioner was detained (which led to his removal on June 9, 2026).

Once a foreign state – such as Nepal in the instant matter – has been designated for TPS by the DHS Secretary, Section 1254a(b)(3) requires the Secretary to: (1) consult with appropriate federal agencies to (2) review the conditions of the foreign state which has been designated TPS to (3) determine whether the statutory conditions supporting TPS continue to exist. 8 U.S.C. § 1254a(b)(3)(A). Once a determination is reached, the Secretary is required to publish a Notice "on a timely basis" for each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register. *Id.* As noted above, DHS published several Notices in the Federal Register throughout the years which, in effect, "continued" TPS for Nepal. Each of these "continuation" Notices provided lengthy discussion as to why TPS would continue for Nepal and included the date for which the TPS period would be extended.

After nearly ten years of Nepal's TPS designation, then-DHS Secretary Noem published a Notice of Termination in the Federal Register as required by Title 8 U.S.C. § 1254a(b)(3)(B). This termination notice published in the Federal Register specifically noted that the DHS Secretary, "[b]ased on her review and consultation with the Department of State . . . overall [found] notable improvements in environmental disaster preparedness and response capacity, as

21

well as substantial reconstruction from the earthquake's destruction such that there is no longer a

disruption of living conditions and Nepal is able to handle adequately the return of its nationals."

In further support of this determination, then-DHS Secretary Noem explained:

The recovery efforts of the Nepalese Government and the international community have addressed the significant damage from the April 25, 2015, earthquake. Per the Nepalese Government's September 2024 Disaster Report on reconstruction, 88.36% of damaged households have been rebuilt. According to the Internal Displacement Monitoring Centre, while some of the people displaced by the earthquake continue to experience ongoing socioeconomic impacts, 90% of the surveyed internally displaced people had bought a new home. In the health sector, 81.43% of damaged facilities have been reconstructed. The World Bank and other donors built more than 300,000 houses and provided technical assistance to communities and local governments. Nepal's National Reconstruction Authority disbanded in 2021 after most impacted structures were rebuilt.

Though Nepal has continued to experience subsequent regional environmental events, including flooding and landslides, the government has made improvements to its preparedness and response capacity. Similar progress has been made in building disaster-resilient housing, infrastructure, and community systems, thus creating a safer and more stable environment for returnees.

Conditions in Nepal have improved in several areas relevant to the affected living conditions and Nepal's ability to handle the return of its nationals. Though Nepal remains one of the poorest countries in the world, its gross domestic product grew two percent from Fiscal Year (FY) 2023 to FY 2024. Nepal's economic growth has been steady in recent years and is forecast to grow at a rate of 4.9% this year. In 2024, inflation also decreased and purchasing power of lower-income households increased.

Additionally, Nepal has been regularly accepting the return of its nationals with final removal orders over the last five years. DHS estimates that there are approximately 12,700 nationals of Nepal (and aliens having no nationality who last habitually resided in Nepal) who hold TPS under Nepal's designation. Of those, approximately 5,500 have become lawful permanent residents of the United States.

90 Fed. Reg. 24151, 24152-53 (June 6, 2025) (footnotes omitted). Based on the June 6,

2025 Notice of Termination published in the Federal Register, and the content of the June

6, 2025 Notice, the Court finds that then-DHS Secretary Noem fully complied with the

22

statutory process set forth in Title 8 U.S.C. § 1254a to terminate Nepal's TPS and thus, does not find any violation of the statutory process set forth in Title 8 U.S.C. § 1254a.[19]

Therefore, on May 6, 2026, when Petitioner was detained, and on June 9, 2026, when Petitioner was removed from the U.S., there was no binding order in effect that altered then-DHS Secretary Noem's termination of Nepal's TPS designation, and Petitioner's TPS was not in effect.

### III. DISCUSSION OF PETITIONER'S CLAIM THAT DEFENDANT'S DETENTION VIOLATED PETITIONER'S SUBSTANTIVE DUE PROCESS RIGHTS (COUNT TWO OF HABEAS PETITION)

Petitioner also asserts that because he had TSP status, as well as pending adjustment-of-status and I-130 applications, when he was detained on May 6, 2026, and thereafter, his detention violates his substantive due process rights under the Fifth Amendment to the United States Constitution. (Doc. 1 at 16-17, Doc. 3 at 18-20).

Specifically, Petitioner argues: "The substantive component of the Due Process Clause is violated for at least three related reasons." (Doc. 3 at 18). "*First,* immigration detention must

---

[19] Notably, this conclusion is consistent with the following conclusion by the Court of Appeal for the Ninth Circuit in its February 9, 2026 Stay Order in *Nat'l TPS All.,* No. 26-199 (9th Cir.):

> In addition, our preliminary analysis of plaintiffs' APA claims is that the government is likely to prevail in its argument that the Secretary's decision-making process in terminating TPS for Honduras, Nicaragua, and Nepal was not arbitrary and capricious. Specifically, the government can likely show that the administrative record adequately supports the Secretary's action, that the TPS statute does not require the Secretary to consider intervening country conditions arising after the events that led to the initial TPS designation, and that the Secretary's decision not to consider intervening conditions does not amount to an unexplained change in policy. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 514–15 (2009). The government also can likely show that the Secretary consulted with appropriate agencies, *see* 8 U.S.C. § 254a(b)(3)(A), adequately considered conditions in Nepal, Honduras, and Nicaragua, and gave facially legitimate reasons for why terminating TPS for each country was warranted.

*Nat'l TPS All.*, No. 26-199 (9th Cir. Feb. 9, 2026) (Doc. 11.1 at 3-4).

always 'bear[] a reasonable relation to the purpose for which the individual was committed'.
*Demore v. Kim*, 538 U.S. 510, 527 (2003) (citing *Zadvydas*, 533 U.S. at 690). Where, as here, the
government has no authority to deport Petitioner, detention is not reasonably related to its
purpose." (*Id*. at 18-19).  "*Second,* because Mr. Pokhrel's removal is barred by the TPS statute,
his continued deprivation of liberty via unlawful detention cannot be narrowly tailored to serve a
compelling government interest.  . . .  Mr. Pokhrel's ongoing detention cannot satisfy that
rigorous standard, where there is no statutory purpose, let alone a compelling government
interest (especially given Mr. Pokhrel's history and lack of criminal record), in his continued
unlawful detention."  (*Id*. at 19-20).  "*Third*, '[f]reedom from bodily restraint has always been at
the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'
*Patel v. Zemski*, 275 F.3d 299, 309 (3d Cir. 2001*), abrogated by Demore; see also Demore*, 538
U.S. at 532 ("Liberty under the Due Process Clause includes protection against unlawful or
arbitrary personal restraint or detention") (Kennedy, J., concurring) (citations omitted). Where
federal law explicitly prohibits an individual's detention, their detention also violates the Due
Process Clause."  (*Id.* at 20).

It is well established that "the Due Process Clause applies to all 'persons' within the
United States, including aliens, whether their presence here is lawful, unlawful, temporary, or
permanent." *Zadvydas v. Da*vis, 533 U.S. 678, 693 (2001).  Thus:

> the Fifth Amendment entitles noncitizens to due process during deportation
> proceedings. Yet "detention during deportation proceedings [is] a constitutionally
> valid aspect of the deportation process." *Demore v. Kim,* 538 U.S. 510, 523 (2003).
> "[T]he through line of history is recognition of the Government's sovereign
> authority to set the terms governing the admission and exclusion of noncitizens."
> *Dep't of State v. Munoz*, 602 U.S. 899, 911-12 (2024). "In the exercise of its broad
> power over naturalization and immigration, Congress regularly makes rules that
> would be unacceptable if applied to citizens." *Matthews v. Diaz*, 426 U.S. 67, 79-
> 80 (1976).

24

*Guzman v. Warden et al.,* Civ. No. 2:26-835, 2026 WL 1413098, at *3 (M.D. Fla. May 20, 2026). *See also Bah v. Warden, Moshannon Valley ICE Processing Ctr*., Civ. No. 3:26-752, 2026 WL 1600632, at *1 n. 1 (W.D. Pa. June 4, 2026) (explaining: "the Supreme Court has held that detention during removal proceedings is a constitutionally permissible part of that process. *See Demore v. Kim,* 538 U.S. 510, 531 (2003); *see also Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (holding that detention beyond the removal period per 8 U.S.C. § 1231 for a period of less than six months pending removal is presumed constitutional").

Simply stated, because: (1) for all of the reasons stated above, Petitioner did not have TPS on May 6, 2026, when DHS detained him, or thereafter; (2) Petitioner was detained on May 6, 2026, pursuant to Section 1231 to effectuate his removal pursuant to his 2016 Final Order of Removal; and (3) Petitioner was only detained for approximately one (1) month before Petitioner was removed from the United States, the Court finds that Respondents did not violate Petitioner's substantive due process rights when they detained, and subsequently removed Petitioner from the U.S.[20]

**IV. DISCUSSION OF PETITIONER'S CLAIM THAT RESPONDENTS VIOLATED HIS PROCEDURAL DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT WHEN, AFTER DETAINING AND RELEASING PETITIONER SUBJECT TO AN OSUP IN JANUARY 2026, DHS RE-DETAINED  PETITIONER WITHOUT PROVIDING HIM ADEQUATE NOTICE AND OPPORTUNITY TO BE HEARD (COUNT THREE OF HABEAS PETITION)**

Petitioner also claims that Respondents violated his procedural due process rights under the Fifth Amendment when, after detaining and releasing Petitioner subject to an Order of Supervision ("OSUP") in January 2026, DHS re-detained Petitioner in May 2026 without providing him adequate notice and opportunity to be heard prior to, or after, re-detaining him.

---

[20] In so holding, the Court disagrees with Petitioner's contention that his immigration-related applications that were pending at the time of Petitioner's May 2026 detention have any effect on the due process rights to which Petitioner was entitled concerning his detention and removal.

25

(Doc. 1 at 17, Doc. 3 at 20-23).

Respondents counter by arguing that Petitioner's challenge to the revocation of his OSUP and his re-detention fail because this Court lacks jurisdiction to review such actions. (Doc. 12 at 11).

On this issue, the Court finds the case of *Roe v. Oddo*, Civ. No. 3:25-128, 2025 WL 3030692 (W.D. Pa. Oct. 30, 2025), decided by my learned colleague, Stephanie L. Haines, to be both instructive and well-reasoned. In *Roe*, the United States District Court for the Western District of Pennsylvania also considered whether a petitioner's procedural due process challenge – specifically, whether re-detaining that petitioner, who had previously been detained and released subject to an OSUP, without providing him adequate notice and opportunity to be heard – violated his procedural due rights. The District Court in *Roe* concluded that it did not have jurisdiction to review Petitioner's claims that ICE's decision to revoke his OSUP and re-detain him violated the Fifth Amendment's Due Process Clause, and in doing so, relied upon *Tazu v. Attorney General of the United States*, 975 F.3d 292 (3d Cir 2020), in relevant part, as follows:

> In *Tazu*, the Third Circuit evaluated, among other issues, an alien detainee's "challenge[ to] his detention" and his argument "that the Government violated its own regulations and thus due process by detaining him without notice, a revocation interview, and an orderly departure." *Id.* at 295–96. Tazu entered the United States unlawfully in 1993. *Id.* at 294. During removal proceedings in 2001, an Immigration Judge granted Tazu's request to leave voluntarily. *Id.* Tazu appealed to the BIA raising an ineffective assistance of counsel claim, which, in 2003, the BIA denied, giving Tazu thirty days to voluntarily depart. *Id.* When Tazu did not voluntarily leave, "his grant of voluntary departure became an order of removal." *Id.* Tazu was subsequently detained while the Government attempted to remove him to his native country of Bangladesh; however, because "it seemed unlikely that a passport would be issued in the foreseeable future[,]" the Government released Tazu in 2009 on OSUP. *Id.* (cleaned up). Tazu remained on OSUP for the next decade and fully complied with the terms of his supervised release. *Id.* at 295. Yet, in 2019, the Government obtained a passport for Tazu and, three days later, "it re-detained him to execute his removal order." *Id.* at 295, 298. Tazu challenged the

26

Government's decision to revoke his OSUP and re-detain him "without first giving him notice and a revocation interview[,]" arguing that this "violated the agency's rules and thus due process." *Id.* at 299 (citing 8 C.F.R. § 241.4(*l*)(1)).

After Tazu's claims wound through the judicial system, he appealed to the Third Circuit which "construe[d] 8 U.S.C. § 1252(b)(9) and (g) "to decide whether the District Court had jurisdiction[.]"". *Id.* at 295. The Third Circuit explained that Tazu's challenge to the Government's decision to re-detain him in order to execute his removal order did "not challenge the Attorney General's *decision* to execute his removal order, [but] it d[id] attack the *action* taken to execute that order. So under § 1252(g) and (b)(9), the District Court lacked jurisdiction to review it." *Id.* 298. In reaching this conclusion, the Third Circuit first evaluated the narrower jurisdiction bar, § 1252(g), and found that "[t]he text of § 1252(g) resolve[d] th[at] claim." *Id.* This was the case because, "to perform or complete a removal, the Attorney General must exercise his discretionary power to detain an alien." *Id.* As such, "detention does not fall within some other 'part of the deportation process[,]' " *id.* (quoting *Reno*, 525 U.S. at 482), but falls squarely within the "decision or action by the Attorney General to...execute [a] removal order"—a decision or action that is insulated from judicial review outside of a petition for review. *See* 8 U.S.C. § 1252(g); *Tazu*, 975 F.3d at 298–99. Thus, the Third Circuit explained that, when re-detention is "simply the enforcement mechanism the Attorney General pick[s] to execute [an alien's] removal... § 1252(g) funnels review away from the District Court . . . . " *Id.*

In applying the broader § 1252(b)(9) to the situation, the Third Circuit began by noting "that if a claim 'aris[es] from any action taken or proceeding brought to remove an alien,' then review of that claim 'shall be available only in judicial review of a final order.' In other words, § 1252(b)(9) funnels that claim into a petition for review." *Id.* at 299 (quoting 8 U.S.C. § 1252(b)(9)). Because § 1252(b)(9) applies specifically to actions taken or proceedings brought to "remove an alien[,]" the Third Circuit explained that, " '[t]o remove an alien' means to send him back permanently to his home country [or designated country of removal.]" *Id.* (citing *E.O.H.C.*, 950 F.3d at 184) (internal quotations added) (quoting 8 U.S.C. § 1252(b)(9)). Thus, it follows, that when the Attorney General re-detains an alien so that he may be removed to the country designated in his final order of removal, "the legal questions [an alien] raises about the scope of the Attorney General's discretion to re-detain him are bound up with (and thus 'aris[e] from') an 'action taken' to remove him[.]" *Id.* Therefore, the Third Circuit found that Tazu's "re-detention challenge *is* directly about removal[;]... [thus,] under

27

§ 1252(g) or § 1252(b)(9), the outcome is the same: the District Court lacked jurisdiction to hear it." *Id.*

*Roe*, 2025 WL 3030692, at *13-14 (footnotes omitted).

Turning to the instant case, Petitioner claims that Respondents' failure to provide him with notice or opportunity to be heard prior to arresting and detaining him (and thereby revoking his OSUP) in May of 2026, violates his due process rights. However, as explained in *Roe,* which interpreted *Tazu,* this Court does not have subject matter jurisdiction to hear this claim. Petitioner's former TPS does not alter or change this outcome.

## V.  CONCLUSION

For all of the above stated reasons, the Court finds that: (1) then-DHS Secretary Noem's 2025 termination of Nepal's TPS designation is lawful and remains in effect, and thus, on May 6, 2026, when Petitioner was detained by DHS, and on June 9, 2026, when Petitioner was removed from the United States, he did not have TPS; and (2) Respondents' detention and removal of Petitioner, who had been issued a final order of removal in 2016, pursuant to Section 1231, was lawful, and not in violation of Sections 1254a(d)(4) and 1254a(a)(1)(A) of the INA or the Due Process Clause of the Fifth Amendment.

Accordingly, Petitioner's Verified Petition For a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. 1) and Emergency Application for a Temporary Restraining Order (Doc. 2), which, with agreement of the parties, was converted to a request for permanent relief, are DENIED.[21]

---

[21] In light of this Court's denial of Petitioner's Verified Petition For a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. 1) and Emergency Application for a Temporary Restraining Order (Doc. 2), which, with agreement of the parties, was converted to a request for permanent relief, it is not necessary to address Petitioner's request, set forth at the June 10, 2026 Motions hearing, that the Court facilitate Petitioner's return to the United States for further proceedings.  (Doc. 17 at 18).

A Judgment Order will be issued forthwith.

The Clerk of Court shall close this case.

SO ORDERED this 15th day of June, 2026,

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:  ECF Counsel of Record

29